JOHNSON CONTROLS, INC., Appellees,

v.

CITY OF CEDAR RAPIDS, IOWA, Appellant.

No. 82–1412.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 10, 1983.

Decided Aug. 2, 1983.

Simmons, Perrine, Albright & Ellwood, Robert C. Tilden, Roger W. Stone, Cedar Rapids, Iowa, Leonard, Street & Deinard, Lowell J. Noteboom, Michael A. Nekich, Minneapolis, Minn., for appellant.

B.C. Hart, Betty L. Hum, Briggs & Morgan, St. Paul, Minn., Robert E. Konchar, Thomas R. Buresh, Moyer & Bergman, Cedar Rapids, Iowa, for appellee Johnson Controls, Inc.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and McMILLIAN, Circuit Judge.

McMILLIAN, Circuit Judge.

The City of Cedar Rapids (the City) appeals from a final order entered in the District Court[1] for the Northern District of Iowa compelling the City to arbitrate a claim for cost over-runs submitted by Johnson Controls, Inc. (Johnson) pursuant to Johnson's contract with the City. For reversal the City argues (1) that the district court misconstrued its contract with Johnson by finding that this dispute was subject to the contract's mandatory arbitration clause and (2) that the tenth amendment to the United States Constitution precludes the court from ordering the City to arbitrate this dispute in contravention of Iowa state law. We affirm the order of the district court for the following reasons.

I. *Background Facts*

The City and Johnson entered into a construction contract in which Johnson agreed to provide the instrumentation and the computer for the City's federally funded Water Pollution Control Facility. During Johnson's phase of the project's construction, a dispute between Johnson and the City arose over the amount of compensation that Johnson was entitled to for "additional" work. On September 4, 1981, Johnson

---

1. The Honorable Edward J. McManus, Chief Judge, United States District Court for the Northern District of Iowa.

submitted an "equitable adjustment" claim to the City for damages and cost over-runs of about $1.2 million. The original total contract price for Johnson's services was just over $2 million. The City denied Johnson's claim on November 4, 1981. Nine days later Johnson filed a demand for arbitration of the dispute under the terms of the contract's "mandatory" arbitration clause. The "mandatory" arbitration clause provides that if one party demands arbitration of a particular dispute governed by the clause, then the other party must submit to arbitration. The City rejected Johnson's demand for arbitration on December 2, 1981, by claiming that the contract's "voluntary" arbitration clause superseded the mandatory arbitration clause. Under the contract's "voluntary" arbitration clause, a dispute can be arbitrated only if *both* parties agree to arbitrate that dispute. Thus, because the City did not wish to arbitrate the issue of additional compensation, arbitration could not be had under the terms of the contract. In response, Johnson filed this suit to compel arbitration based upon diversity jurisdiction, 28 U.S.C. § 1332 (1976), and the federal Arbitration Act, 9 U.S.C. § 4 (1976). The district court rejected the City's tenth amendment challenge to forced arbitration and ruled that the mandatory arbitration clause governed this particular dispute. *Johnson Controls, Inc. v. City of Cedar Rapids,* No. C 81–140, slip op. at 3–6 (N.D.Iowa Mar. 26, 1982). The district court therefore ordered the City to arbitrate the cost over-run. This appeal ensued.

II. *Contract Construction Under the Arbitration Act*

When a party to an interstate contract invokes the Arbitration Act to enforce a putative arbitration clause within that contract, the court's review is limited to two issues: (1) whether an express written agreement to arbitrate the subject matter of the present dispute exists between the parties, and (2) if so, whether the agreement to arbitrate has been breached. *National R.R. Passenger Corp. v. Missouri Pacific R.R.,* 501 F.2d 423, 427 (8th Cir.1974).

In addressing each issue, the court must apply federal substantive law, although applicable non-discriminatory state law may provide a helpful reference in formulating the federal rule of decision. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* —— U.S. ——, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1458–59, 59 L.Ed.2d 711 (1979) (relying on state law to give content to the federal rule of decision). The court must also be guided by "the liberal federal policy favoring arbitration" in contracts governed by the Arbitration Act. *Moses H. Cone Memorial Hospital,* 103 S.Ct. at 941. Thus, any doubts about the construction or breach of the putative arbitration provision are to be resolved in favor of ordering arbitration. *Id.; National R.R. Passenger Corp.,* 501 F.2d at 428.

The parties stipulated to the facts relevant to the construction of the contract. There is no disagreement that the City is refusing to arbitrate under the contract. Thus, the only pertinent issue in this case is whether the City and Johnson entered into a unilaterally enforceable agreement to arbitrate this particular dispute. To resolve this issue, we need to decide what effect is to be given each of the two seemingly contradictory arbitration clauses.

The actual structure of a written document is often helpful in construing its contents. The present contract is divided into two main parts: the General Conditions, and the Supplemental Conditions. The mandatory arbitration clause is contained in § 30.1 of the General Conditions [hereinafter cited as General § 30.1]. It provides:

30 ARBITRATION

30.1 All claims, disputes and other matters in question arising out of, or relating to, the CONTRACT DOCUMENTS or the breach thereof ... shall be decided by arbitration .... This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment

may be entered upon it in any court having jurisdiction thereof.

The voluntary arbitration clause is contained in § 7 of the Supplemental Conditions [hereinafter cited as Supplemental § 7]. It provides:

7. *Remedies*

Except as otherwise provided in this contract, all claims, counterclaims, disputes and other matters in question between the Owner and the Contractor arising out of or relating to this agreement or breach thereof will be decided by arbitration if the parties hereto mutually agree, or in a court of competent jurisdiction within the State in which the Owner is located.

Also of importance is § 1 of the Supplemental Conditions, which states that the provisions contained in the Supplemental Conditions "shall supersede any conflicting provisions of this contract."

The City advances four main arguments relating to the construction of the contract. The City's first argument is that the mandatory arbitration clause and the voluntary arbitration clause are "conflicting" and, therefore, under Supplemental § 1 the voluntary arbitration clause controls because it is contained in the Supplemental Conditions. As a corollary to this argument, the City asserts that the voluntary arbitration clause is more specific than the mandatory arbitration clause and under Iowa law the more specific clause will control a general clause.

■■■■ This argument has superficial appeal. Yet, an elementary rule of contract interpretation is that a contract should be construed so as to give effect to all the contract's provisions. *SCM Corp. v. United States,* 675 F.2d 280, 283 (Ct.Cl.1982).[2] Similarly, if two clauses of a contract appear to be in conflict, the preferred interpretation is the one that gives a "harmonious interpretation" to the clauses in order to avoid rendering either one nugatory. *Boyajian v.*

*United States,* 423 F.2d 1231, 1247, 191 Ct.Cl. 233 (1970). By its own terms, the voluntary arbitration clause removes any conflict between it and the mandatory arbitration clause by providing that the voluntary arbitration clause is available *"[e]xcept where otherwise provided in this contract."* Supplemental § 7 (emphasis added). The voluntary arbitration clause, therefore, defers to the mandatory arbitration clause in situations where the mandatory arbitration clause applies because those situations are "otherwise provided for" in the contract. Any situation not covered by the mandatory arbitration clause will be subject to the voluntary arbitration clause, for example those disputes which do not arise out of the contract documents themselves. This interpretation is the only one that gives effect to the whole contract; therefore it is the preferred construction. We also fail to see how Supplemental § 7 is in any way more specific than General § 30.1.

The City's second argument is that the Environmental Protection Agency's (EPA) role in funding the project and drafting the project's contracts is relevant to show what the parties intended the contract's language to mean. The EPA was the major source of funds for the City's construction of its water treatment project. The project was constructed in three phases. Johnson's contract was to be performed as part of the second phase. When the first phase started, the EPA required all contracts for the project to contain the General § 30.1 mandatory arbitration clause. But when the City submitted the second phase contracts, including Johnson's contract, to the EPA for the EPA's approval, the EPA reversed its position on mandatory arbitration. According to the City, the EPA discovered that mandatory arbitration created too many problems and had become counterproductive. Thus, starting in February 1977, all contracts for EPA funded projects were required to contain a Supplemental

---

2. *Accord Douglas v. United States Tobacco Co.,* 670 F.2d 791, 795 (8th Cir.1982) (Arkansas law); *Omaha Paper Stock Co. v. Harbor Ins. Co.,* 596 F.2d 283, 287 (8th Cir.1979) (Nebraska law); *Fitch v. Doke,* 532 F.2d 115, 117 (8th Cir.1976) (general statement of common law rule); *Harrison Sheet Steel Co. v. Morgan,* 268 F.2d 538, 542 (8th Cir.1959) (Iowa law).

§ 7 voluntary arbitration clause. Johnson's second phase contract was drafted before 1977 and, therefore, it contained a General § 30.1 mandatory arbitration clause. But because it was not sent to the EPA for approval until after February 1977, the City also included a Supplemental § 7 voluntary arbitration clause in order to comply with the EPA regulations and ensure EPA approval. The City claims that the continued inclusion of General § 30.1 in the contract after February 1977 was a mere oversight and that the City's failure to delete it should be given no significance. In the City's view the real intent of the parties was to comply with the directives of the EPA, which clearly rejected mandatory arbitration in favor of voluntary arbitration. Thus, the City argues that the vicarious intent of the parties was to have Supplemental § 7's voluntary arbitration provision supersede General § 30.1.

■ While this argument is interesting and novel, we find it unpersuasive as applied to the facts before us. It must be remembered that our function in construing this contract is to determine the parties' intent from what they said and not from what they meant to say. *Cf. Commercial Metals Co. v. United States,* 176 Ct.Cl. 343, 349–53 (1966) (per curiam) (a party's historical practice and subjective intent, which have not been incorporated into the written contract, cannot be used to modify the language actually used in the written contract).[3] The EPA's "intent" in requiring the inclusion of Supplemental § 7 in all EPA funded contracts has been fully articulated by the EPA itself:

> [T]he [proposed remedies] clause was read by many commentators as mandating arbitration. That was not the intent. The clause has been revised to reduce the emphasis on arbitration, and now specifically mentions both the option of arbitration and the option of remedy in the courts. The parties could also agree in the basic agreement to some other mechanism, such as a Board of Contract Appeals, or the like, in the larger municipalities.

41 Fed.Reg. 56634 (Dec. 29, 1976).

■ It is clear from this statement that although mandatory arbitration is no longer required by the EPA, neither is mandatory arbitration forbidden. That is why Supplemental § 7 includes the phrase "except as otherwise provided for in this contract" so that the parties may provide for mandatory arbitration as was done in this case. Thus, it is not true that after 1977 the EPA required voluntary arbitration. All the EPA required was that Supplemental § 7 be included. Supplemental § 7, by its purpose and express language, leaves it to the parties' discretion whether they want to provide for voluntary arbitration or would prefer another type of dispute resolution mechanism—such as mandatory arbitration. The City, by leaving General § 30.1 in the contract, so provided. If any ambiguity has been created by the incorporation of both of these clauses in the contract, that ambiguity must be resolved against the drafter of the contract, which in this case is the City. *Thanet Corp. v. United States,* 591 F.2d 629, 633, 219 Ct.Cl. 75 (1979).[4]

■ The City's third argument is based on federal policy. The City acknowledges that there exists a general federal policy that favors arbitration in contracts governed by the Arbitration Act. However, the City asserts that the EPA has expressed a more specific federal policy which disfavors mandatory arbitration in EPA funded municipal construction contracts. The City argues that this more specific federal policy

3. *Accord Kimbell Foods, Inc. v. Republic Nat'l Bank,* 557 F.2d 491, 496 (5th Cir.1977) (Texas law), *aff'd,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *Cepeda v. Swift & Co.,* 291 F.Supp. 242, 245 (E.D.Mo.1968) (Missouri law), *aff'd,* 415 F.2d 1205 (8th Cir.1969); *Hamilton v. Wosepka,* 261 Iowa 299, 154 N.W.2d 164, 167 (1967).

4. *Accord Truelsen v. European Health Spa of Nebraska,* 561 F.2d 169, 170 (8th Cir.1977) (per curiam) (Nebraska law); *Telex Corp. v. Balch,* 382 F.2d 211, 216 (8th Cir.1967) (Minnesota law); *Village Supply Co. v. Iowa Fund, Inc.,* 312 N.W.2d 551, 555 (Iowa 1981).

disfavoring arbitration must prevail over the general federal policy of the Arbitration Act. This argument lacks merit. First of all, we are not convinced that the EPA has articulated a federal policy disfavoring mandatory arbitration. As noted above, the EPA has taken a flexible approach to the issue. Secondly, even if there were such an EPA policy, it would be highly inappropriate to credit the policy of an administrative agency over the express policy of Congress as articulated in an applicable statute.

■ The City's final contract argument is also based on public policy, specifically Iowa public policy. The City claims that at the time this contract was entered into, Iowa law rendered executory arbitration agreements generally unenforceable. *Joseph L. Wilmotte & Co. v. Rosenman Bros.*, 258 N.W.2d 317, 325 (Iowa 1977). Iowa law also provides that municipalities are without power to make contracts that are inconsistent with state law. *See Incorporated City of Humboldt v. Knight*, 255 Iowa 22, 120 N.W.2d 457, 460–61 (1963). Thus, the City asserts that if the contract is construed as providing for mandatory arbitration, the contract would be *ultra vires* and void under Iowa law. The City argues that the contract should therefore be construed as providing for voluntary arbitration in order to avoid any possible violation of Iowa law. The City's argument is misplaced. The Arbitration Act was specifically enacted to reverse antiquated state rules of law that make arbitration agreements revocable at will anytime prior to the issuance of the arbitration award. *Collins Radio Co. v. Ex-Cell-O Corp.*, 467 F.2d 995, 997–98 (8th Cir. 1972). *See* H.R.Rep. No. 96, 68th Cong., 1st Sess. 1–2 (1924); S.Rep. No. 536, 68th Cong., 1st Sess. 2–3 (1924). Because federal substantive law pre-empts state law governing the enforceability of arbitration agreements in interstate contracts, the present contract is not unenforceable under applicable federal law. Hence, construing the contract as providing for mandatory arbitration would not be against controlling federal public policy. To the contrary, federal policy favors arbitration in interstate contracts.

Guided by this policy and the above rules of contract construction, we agree with the district court that in this case the mandatory arbitration provision prevails over Supplemental § 7's voluntary arbitration provision. Only this interpretation gives reasonable effect to all the terms of the contract.

### III. *The Tenth Amendment*

■ The City advances a rather forceful tenth amendment challenge to the enforcement of the mandatory arbitration clause under the Arbitration Act. The City relies heavily on the Supreme Court's ruling in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). Under the Supreme Court's recent tenth amendment cases, there are at least three, and at times four, elements to a tenth amendment challenge, each of which must be shown in order for the challenge to be successful:

(1) The federal action must regulate the "state as a state";

(2) The federal action must regulate "matters that are indisputable 'attribute[s] of state sovereignty' ";

(3) The state's compliance with the federal action or statute must directly impair the state's "ability 'to structure integral operations in areas of traditional governmental functions' "; and

(4) In situations where there is a weighty federal interest, the state must show that the nature of the federal interest advanced is not so great that it justifies state submission to the federal action.

*Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 287–88, 101 S.Ct. 2352, 2365–66, 69 L.Ed.2d 1 (1981), *quoting National League of Cities*, 426 U.S. at 845, 852, 854, 96 S.Ct. at 2471, 2474, 2475. *See also Equal Employment Opportunity Comm'n v. Wyoming*, — U.S. —, —, 103 S.Ct. 1054, 1061, 75 L.Ed.2d 18 (1983) *(EEOC v. Wyoming), quoting Hodel*, 452 U.S. at 288 n. 29, 101 S.Ct. at 2366 n. 29.

█ The City contends that the exercise of federal commerce power to compel the City to arbitrate would force the City and the State of Iowa to adopt the federal government's choice of forum for the resolution of Iowa's municipalities' disputes. According to the City, its choice of forum, and Iowa's regulation of Iowa municipalities, are essential decisions about integral local governmental functions. Thus, the City argues that under *National League of Cities,* compelling the City to arbitrate under the Arbitration Act would be an unconstitutional intrusion upon state sovereignty. In reality, the City's tenth amendment argument has two aspects. First, the City contends that the City itself is the state entity protected by the tenth amendment and that the Arbitration Act impermissibly regulates the City's sovereign prerogative not to arbitrate. Second, the City contends that the State of Iowa is the state entity protected by the tenth amendment and that the Arbitration Act impermissibly preempts Iowa's regulation of its municipalities' affairs, including the manner in which its municipalities resolve their disputes. The City has standing to assert both aspects of its tenth amendment argument. *National League of Cities,* 426 U.S. 836–37 n. 7, 96 S.Ct. at 2467 n. 7; *Friends of the Earth v. Carey,* 552 F.2d 25, 33–34 (2d Cir.1977), *cert. denied,* 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977). We will address each aspect in turn.

### A. The City As The Protected State Entity

It seems clear that enforcement of the Arbitration Act directly against the City regulates the City *qua* state entity. It is less clear that entering into an interstate contract is an attribute of state sovereignty. However, when a federal law is being applied directly against a state entity in order to compel the state entity to conduct its own affairs in conformity with the federal law, the Supreme Court has avoided the first two parts of the *National League of Cities* test and has proceeded directly to the third or "key prong" of that test. *See, e.g., Transportation Union v. Long Island*

*R.R.,* 455 U.S. 678, 684, 102 S.Ct. 1349, 1353, 71 L.Ed.2d 547 (1982). The City argues that this dispute concerns essential decisions about how the City manages its citizens' sanitation problems and that sanitation is a traditional governmental function. Further, the City claims that if the City is forced to arbitrate, it will have to pay huge sums on Johnson's claims for which the City might not have the power to tax. Thus, arbitration would drain the City's coffers and force it to restructure totally its integral operations in sanitation management, as well as in other areas of its traditional governmental functions.

In analyzing a tenth amendment defense to the exercise of Congress's commerce power, it is important to note at the outset the precise federal law that is being brought to bear against the state entity and what is the precise state activity or concern at which the federal law is being directed. If a generally applicable regulation, in its present specific application, is being *primarily* directed at a state entity's own activities in a traditional local governmental function or has a severe debilitating impact on a state entity's ability to perform a traditional local governmental function, then the state entity may well meet the third part of the *National League of Cities* test. *See EEOC v. Wyoming,* 103 S.Ct. 1062–64 & n. 14. On the other hand, if the federal regulation in its present application is primarily directed at private conduct and merely preempts the state entity's ability to regulate similar conduct, then the state entity will have failed the third part of the *National League of Cities* test. *Hodel,* 452 U.S. at 289–90, 101 S.Ct. at 2366–67. *See Federal Energy Regulation Commission v. Mississippi,* 456 U.S. 742, 758–59, 102 S.Ct. 2126, 2136–37, 72 L.Ed.2d 532 (1982) (*FERC v. Mississippi*).

Here the federal law is obviously the Arbitration Act. The Arbitration Act is primarily directed at the interpretation and enforcement of interstate arbitration clauses and not at regulating the City's operation of its waste treatment facility. Hence, this case is unlike *Transportation Union v.*

*Long Island R.R. Co.,* 634 F.2d 19 (2d Cir. 1980), *rev'd,* 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982), cited by the City to support the proposition that *any* federal interference with a state entity's interest in dispute resolution relating to traditional local governmental functions (such as sanitation) is forbidden by the tenth amendment. The *Transportation Union* case involved the federal Railway Labor Act's regulation of interstate railroads, rather than a regulation of dispute resolution mechanisms *per se.* The Supreme Court held in *Transportation Union* that operating a railroad was not a traditional governmental function and enforced the Railway Labor Act against the State of New York.

The present case is actually analogous to *National League of Cities* itself, as well as to *EEOC v. Wyoming,* which is the Supreme Court's latest pronouncement on the tenth amendment. In both cases, the Supreme Court's tenth amendment analysis focused on the secondary *impact* that the federal regulation had on traditional local governmental functions, even though the regulation was not primarily directed at a traditional local governmental activity. The decisive issue in these cases was whether the federal regulation had such a debilitating impact on the state entity's ongoing relationship with its employees in areas of traditional local governmental functions that the state entity would have to restructure the delivery of those vital public services in order to comply with the federal regulation. In *National League of Cities,* the Court held that the minimum wage and maximum hour regulations of the federal Fair Labor Standards Act, 29 U.S.C. §§ 206, 207 (1976) (FLSA), did have such an impact and, therefore, ruled that the tenth amendment barred enforcement of the FLSA against state entities. In *EEOC v. Wyoming,* the Court held that the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634 (1976) (ADEA), did not have such an impact and, therefore, enforced the ADEA against Wyoming. In our view, these two cases are irreconcilable. To the extent *National League of Cities,* 426 U.S. at 849–52, 96 S.Ct. at 2473–74, can

be read to hold that a state government's relationship with its employees, in and of itself, is a traditional local governmental function that may not be regulated under the federal commerce clause, it has been overruled by the holdings in *Equal Employment Opportunity Comm'n v. Wyoming,* —— U.S. ——, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), and *Transportation Union v. Long Island R.R.,* 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982). Indeed, the majority opinion in *National League of Cities* may have been overruled *in toto* by the Court's subsequent tenth amendment cases, in favor of the balancing test articulated by Justice Blackmun in his pivotal concurring opinion in *National League of Cities,* 426 U.S. at 856, 96 S.Ct. at 2476. At the very least the *National League of Cities* holding has been narrowly confined to its precise facts. *Compare National League of Cities,* 426 U.S. at 849–51, 96 S.Ct. at 2473–74 *with EEOC v. Wyoming,* 103 S.Ct. at 1062–64; *Federal Energy Regulatory Comm'n v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982); *Transportation Union v. Long Island R.R.,* 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547; *and Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

The City seeks to draw an analogy between this case and *National League of Cities.* The City contends that the Arbitration Act will "significantly alter or displace [its] abilit[y] to structure [its contractual] relationships in such areas as ... sanitation, public health and parks and recreation," which are all traditional local governmental functions. *National League of Cities,* 426 U.S. at 851, 96 S.Ct. at 2474. The City complains that because the potential arbitration award would nearly double the original cost of the project and that the City might not have the power to tax its citizens in order to pay the award, the City may have to forego operation of the new sanitation facility once the facility is completed. Thus, the City claims that the impact of enforcing the Arbitration Act against it will be severe and therefore urges

this court to hold the City immune from the Arbitration Act under the tenth amendment.

Although superficially appealing, the City's argument proceeds from incorrect premises. First, the Arbitration Act does not compel a party to arbitrate an interstate contract dispute, unless of course that party has voluntarily agreed to arbitrate the dispute and that voluntary agreement is evidenced by a writing. Here, the City, of its own free choice, entered into the contract with Johnson, and as discussed above, the City voluntarily incorporated mandatory arbitration into the terms of that contract.[5] All the Arbitration Act does is to make the City's voluntary commitment to arbitration specifically enforceable. It does not control, limit, or eliminate the City's initial choice of any forum for the resolution of its disputes. Thus, the Arbitration Act has not withdrawn any authority from the City to structure its own affairs in any way. See National League of Cities, 426 U.S. at 851, 96 S.Ct. at 2474. The Arbitration Act merely requires the City to live up to the contractual obligation that the City itself structured. Because it is limited to consensual agreements, the Arbitration Act does not affect the City's basic "prerogatives in such a way as would be likely to hamper the [City's] ability to fulfill its role in the Union and endanger its 'separate and independent existence.'" Transportation Union v. Long Island R.R., 455 U.S. at 686–87, 102 S.Ct. at 1354–55. See also United States v. District of Columbia, 654 F.2d 802, 808 (D.C.Cir.) (tenth amendment cannot be used to bar enforcement of a consent decree voluntarily entered into by a state entity), cert. denied sub nom. Prince George County v. United States, 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981). The City is free under the Arbitration Act to resolve its disputes outside of arbitration, or in the courts, or in any way it thinks best—so long as the City does not voluntarily contract to arbitrate while engaging in interstate commerce.

Second, the consequential impact of the order compelling arbitration in this case will have a negligible effect on the City's provision of vital public services, including sanitation. As the Supreme Court made plain in EEOC v. Wyoming, the National League of Cities financial impact test does not depend on "'particularized assessments of actual impact,' which may vary from State to State and time to time, but on a more generalized inquiry, essentially legal rather than factual, into the direct and obvious effect of the federal legislation on the ability of the States to allocate their resources." 103 S.Ct. at 1063. An order compelling arbitration does not direct the arbitrator to enter any particular award for or against the state entity. Because the City has an equal chance to prevail in arbitration as it does in court, we can find no direct impairment of the City's ability to structure its sanitation operations or other traditional local governmental functions occasioned by

---

**5.** The City's response is that it did not voluntarily incorporate the mandatory arbitration clause into the contract, but did so only because it was required to under the then prevailing EPA regulations. A state entity, however, may not rely upon the tenth amendment to avoid or disavow as involuntary its compliance with a condition attached to the receipt of federal funds. See Federal Energy Regulatory Comm'n v. Mississippi, 456 U.S. 742, 766, 102 S.Ct. 2126, 2140–2141, 72 L.Ed.2d 532 (1982), citing Oklahoma v. CSC, 330 U.S. 127, 143, 67 S.Ct. 544, 553, 91 L.Ed. 794 (1947); Middlesex County Util. Auth. v. Borough of Sayerville, 690 F.2d 358, 364–65 (3d Cir.1982) (rejecting tenth amendment challenge to enforcement of an EPA required contract clause in an EPA funded waste treatment plant construction contract), cert. denied, —— U.S. ——, 103 S.Ct. 1273, 75 L.Ed.2d 495 (1983). Additionally, the mandatory arbitration clause was not a required part of EPA funded contracts at the time the City's contract was submitted for EPA approval. Insofar as the City argues that the clause was inadvertently left in the contract and should be deleted as a unilateral mistake, we refuse to address it because it was not raised below. We do note, however, that no EPA regulation specifically makes the Arbitration Act applicable to EPA funded construction contracts. See 40 C.F.R. §§ 30.405 through 30.405–12, 30.410 through 30.410–4, 30.415 through 30.415–4, 30.420 through 30.420–6, 30.-425 (1977). See also Pennhurst State School v. Halderman, 451 U.S. 1, 24–25, 101 S.Ct. 1531, 1543–1544, 67 L.Ed.2d 694 (1981) (requiring that conditions attached to federal grants must be expressed clearly by Congress in the statute so that the state can "knowingly decide whether or not to accept those funds.").

the order to compel arbitration. For these two reasons, the City has failed to meet the third part of the *National League of Cities* test and, therefore, its tenth amendment challenge to the enforcement of the Arbitration Act against the City as the state entity must fail.

### B. *Iowa As The Protected State Entity*

██ The City asserts that Iowa municipalities, in general, are without power to enter into contracts that are inconsistent with Iowa law. According to the City, the Iowa Supreme Court has expressly held on several occasions that executory common law arbitration agreements are unenforceable. Proceeding from these two premises, the City, in a disingenuous leap of logic, argues that the State of Iowa has denied Iowa municipalities *the power* to enter into executory arbitration agreements. Because a state's control over the municipalities it creates and empowers goes to the very core of the state's sovereignty, the City argues that the tenth amendment should prohibit any federal attempt to grant an Iowa municipality a power that the municipality is expressly denied under Iowa law. For several reasons, we find this aspect of the City's tenth amendment challenge to be without merit.

First, we have found no Iowa statute or Iowa Supreme Court case that would specifically forbid a municipality from entering into an executory arbitration agreement or from arbitrating disputes such as the one present in this case. *See, e.g., Hawkins/Korshoj v. State Board of Regents,* 255 N.W.2d 124, 128 (Iowa 1977) (enforcing a common law arbitration clause against a state entity in a construction contract dis-

pute). At most, there once existed a common law rule that, in general, executory arbitration agreements that do not meet statutory requirements may be freely revoked by either party before the arbitrator enters his award. However, even under this harsh common law rule, executory arbitration agreements were not void, rather they were merely voidable. There is no Iowa public policy against arbitration. To the contrary, Iowa's public policy has long favored arbitration as a means of resolving commercial disputes. *See, e.g., Jefferson County v. Barton-Douglas Contractors, Inc.,* 282 N.W.2d 155, 158 (Iowa 1979); *Hawkins/Korshoj,* 255 N.W.2d at 127–28 (relying on the federal Arbitration Act as a matter of Iowa law and quoting with approval our decision in *National R.R. Passenger Corp. v. Missouri Pacific R.R.,* 501 F.2d 423, 427–28 (8th Cir.1974)); *First National Bank in Cedar Falls v. Clay,* 231 Iowa 703, 2 N.W.2d 85, 91 (1942). The Iowa Supreme Court has frequently enforced common law arbitration awards. *See, e.g., Joseph L. Wilmotte & Co. v. Rosenman Bros.,* 258 N.W.2d 317, 330 (Iowa 1977) (applying New York law) and cases cited at 325. Indeed, in our research, the latest case we have found in which the Iowa Supreme Court actually held an executory arbitration agreement to be unenforceable under the common law rule was in 1895. *See Prader v. National Masonic Accident Ass'n,* 95 Iowa 149, 63 N.W. 601, 605 (1895).[6] Although the Iowa Supreme Court has often recited the common law rule, in so doing it has always attacked the continued vitality of the rule and then proceeded to enforce the particular arbitration agreement at issue. *See, e.g., Litchsinn v. American Inter-*

---

**6.** See *Litchsinn v. American Interinsurance Exchange,* 287 N.W.2d 156, 158–60 (Iowa 1980) (altering the common law rule); *Jefferson County v. Barton-Douglas Contractors, Inc.,* 282 N.W.2d 155, 158 (Iowa 1979) (suggesting changing the common law rule but refusing to enforce the arbitration clause because the subject matter of the arbitrable dispute was being litigated and Iowa Rules of Civil Procedure require that all related causes must be joined and resolved in one forum); *Joseph L. Wilmotte & Co. v. Rosenman Bros.,* 258 N.W.2d 317, 325, 328–30 (Iowa 1977) (noting the weakening of the common law rule and enforcing

the arbitration agreement under New York law); *Wallace v. Brotherhood of Locomotive Firemen & Enginemen,* 230 Iowa 1127, 300 N.W. 322, 325 (1941) (refusing to enforce arbitration because one of the parties was the arbitrator); *Oskaloosa Sav. Bank v. Mahaska County State Bank,* 219 N.W. 530, 533–34 (Iowa 1928) (award enforced); *Ames Canning Co. v. Dexter Seed Co.,* 195 Iowa 1285, 190 N.W. 167, 169–71 (1923) (party cannot revoke arbitration if he accepts benefits of the tentative award before the final award is reduced to writing).

insurance *Exchange,* 287 N.W.2d 156, 159–61 (Iowa 1980) (noting Iowa's movement away from the common law rule and changing the common law rule in situations where an insured invokes arbitration pursuant to an arbitration clause in an insurance policy). Further, in 1981, the Iowa legislature enacted a liberal arbitration statute, modeled after the Uniform Arbitration Act, 7 U.L.A. 1 (1978), which favors arbitration. *See* Iowa Code Ann. §§ 679A.1–.19 (West Supp.1982). But for the new statute's non-retroactivity provision, § 679A.18, the arbitration agreement at issue in this case would be enforceable in an Iowa court under Iowa law. Hence, we fail to see how Iowa, either through its legislature or its courts, has made a sovereign decision to forbid its municipalities from entering into executory arbitration agreements. *See Sergeant Bluff-Luton Education Ass'n v. Sergeant Bluff-Luton Community School District,* 282 N.W.2d 144, 147 (Iowa 1979) (noting the Iowa General Assembly's favorable view of arbitration in disputes between state entities and their employees). To the contrary, the Iowa Supreme Court has expressly looked to the federal Arbitration Act as a guiding rule of decision in its own law. *See Hawkins/Korshoj,* 255 N.W.2d at 126–28.

Second, even if under Iowa law an Iowa municipality has no power to enter into executory common law arbitration agreements as argued by the City, we hold that the tenth amendment does not immunize the City from enforcement of the Arbitration Act. Again, it is important to note the precise state activity at which the federal law is being primarily directed. As far as the State of Iowa is concerned, the Arbitration Act is being enforced directly against two private parties over whom both Iowa and the federal government have sovereign authority. In this way the Arbitration Act is not being enforced directly against Iowa as a State. Instead, the Arbitration Act's effect on Iowa is to displace Iowa's exercise of its police powers over these two parties' activities in interstate commerce. As was noted in *Hodel:* "The Court long ago rejected the suggestion that Congress invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority under the Commerce Clause in a manner that displaces the States' exercise of their police powers." 452 U.S. at 291, 101 S.Ct. at 2368. *See FERC v. Mississippi,* 456 U.S. at 766–67, 102 S.Ct. at 2140–41; *National League of Cities,* 426 U.S. at 845, 96 S.Ct. at 2471. The Arbitration Act, therefore, does not regulate Iowa as a state.[7]

The second aspect of the City's tenth amendment challenge also fails the fourth part of the *National League of Cities/Hodel* test. This is the balancing test first articulated by Justice Blackmun in his concurring opinion in *National League of Cities,* 426 U.S. at 856, 96 S.Ct. at 2476, and embraced by the Court in *Hodel,* 452 U.S. at 288 n. 29, 101 S.Ct. at 2366 n. 29, and *EEOC v. Wyoming,* 103 S.Ct. at 1061. On the federal side of the balance, we note that there is a general federal interest in regulating interstate commercial activities. Also, the fed-

---

7. An argument may be raised that the City is not a "private" party and, therefore, the *Hodel* and *FERC v. Mississippi* cases, which hold that under the tenth amendment "Congress may impose conditions on the state's regulation of *private* conduct in a pre-emptible area," are inapposite. *FERC v. Mississippi,* 456 U.S. 742, 769–70 n. 32, 102 S.Ct. at 2142–43 n. 32 (1982) (emphasis added). The argument lacks force, however, because the Iowa law sought to be displaced by enforcement of the Arbitration Act was adopted primarily to regulate private conduct. As noted above, no Iowa law forbids or denies Iowa municipalities the power to enter into executory arbitration agreements. The City is able to invoke the Iowa common law permitting revocation of an executory arbitra-

tion agreement, not because it is a public entity, but simply because it entered into a putative arbitration agreement in the same way any other private party may invoke the common law rule. It is a mere fortuity that one of the parties happens to be a municipality. In *FERC v. Mississippi,* the Supreme Court held that when Congress displaces state regulation of private conduct in a pre-emptible area, Congress may also require the state entity to conduct its own affairs in accordance with the federal regulation as a condition to the state entity's continued participation in the pre-emptible area. 456 U.S. at 770–71, 102 S.Ct. at 2143. Thus, *Hodel* and *FERC v. Mississippi* are fully applicable to this case.

eral government has a particularly strong interest in the prompt resolution of a dispute concerning a federally funded construction project through the enforcement of this interstate arbitration agreement. On Iowa's side of the balance, there is the negligible, if not, non-existent, policy disfavoring the enforcement of executory common law arbitration agreements. We conclude that the nature of the federal interest advanced is such that it justifies state submission to the Arbitration Act. *Id.*

In conclusion, as a matter of federal law, we read the contract between the City and Johnson as requiring arbitration of this cost-overrun dispute upon the demand of either party. The tenth amendment does not bar the enforcement of this provision of the contract against the City under the Arbitration Act. Accordingly, we affirm the district court's order compelling the City to submit to the arbitration of Johnson's claim for additional compensation.